**Clyde McEVERS, Appellee,**

v.

**OKLAHOMA DEPARTMENT OF CORRECTIONS, APPOINTING AUTHORITY, Appellant.**

**No. 52256.**

Court of Appeals of Oklahoma, Division No. 2.

July 1, 1980.

Released for Publication by Order of Court of Appeals July 31, 1980.

William Layden, Layden & Layden, McAlester, for appellee.

Jerry Earl Benson, Asst. Atty. Gen., Harold B. McMillan, Jr., Asst. Atty. Gen., Chief, Federal Division, Larry Derryberry, Atty. Gen., Oklahoma, for appellant.

BRIGHTMIRE, Presiding Judge.

Under attack is an adjudication by the Pittsburg County District Court reversing the Oklahoma State Personnel Board's decision to uphold Clyde McEvers' dismissal as an employee [1] of the Oklahoma State Department of Corrections. The judge ordered Corrections to reinstate McEvers retrospectively to the date of termination subject only to loss of 60 days pay, and Corrections appeals contending that the Personnel Board's order was based on substantial competent evidence and was not otherwise erroneous. We agree and reverse.

I

The facts underlying the controversy are not in great conflict. McEvers went to work at the McAlester prison facility December 3, 1974, where he served as a Correction Officer II until July 31, 1976. About a week later the employee received a letter of termination.

The precipitating cause of the discharge was a five day unauthorized absence from work which occurred because, as McEvers put it, "I had to go to Amarillo, Texas, to pick my wife up." His spouse, he said, had flown in from California where she had lived during a period of separation spawned by "a lot of family problems."

McEvers had not had a vacation since going with Corrections. He had taken off from work in the past and with regard to at least two such absences he was "docked," [2] evidently because one time he failed to give his superior advance notice of the proposed absence and another time he failed to get a required doctor's certificate to substantiate

---

1. He worked as a prison guard at the Oklahoma State Penitentiary in McAlester, Oklahoma.

2. A term meaning he was not paid.

a "sick leave." McEvers could not say how many days he had missed during the year and a half he had worked at the prison but there were "[q]uite a few of them." He had, for instance, "taken off a lot" while his father was in the hospital and had taken off "5 or 7" days when his wife had a baby. His custom was to just call in before commencement of his shift, or have someone else call, and advise the "receptionist" that he would be off from work two or three days.

This was the situation in the spring of 1976 when he began asking his supervisor for an annual leave. "I was turned down twice," said McEvers. He then went to his captain for approval of a leave saying he "wanted to go to California to pick up his kids." The captain refused and explained that because of being shorthanded no leaves were granted from February until May and after May leaves began to be granted according to seniority. "He [McEvers]," the captain told the Board, "just didn't have enough seniority to get it." Finally, in late July, McEvers made his request to the deputy warden who said he would try to help him out. Before the warden could act, however, the guard decided to just take off.

McEvers, who worked the day shift with Fridays and Saturdays off, completed his shift on Thursday, July 29. On Saturday the 31st, without notifying his supervisor or anyone else at the prison, McEvers said he headed for Texas "to pick up my wife." He spent the night at his mother-in-law's home in Childress, Texas, the next day, Sunday, got his wife and returned to Childress

where he stayed until he returned to McAlester Thursday, August 5.

In the meantime, McEvers said, he called his mother in McAlester Saturday night (July 31) and asked her to call the prison receptionist and advise that he would "be gone." No effort was made by him to let his supervisor know about his plans before leaving McAlester nor even after he got to Texas. According to the evidence the supervisor got no information from the receptionist and he did not know why McEvers failed to show up for work Sunday morning, or when he would be back, or anything else. Efforts to reach McEvers were fruitless, of course. McEvers said that before he left on the 31st he told his brother that if he had not returned in three days he wanted "them to make another phone call and tell them that I wouldn't be at work."

After five consecutive days of being absent McEvers was considered to have resigned and on August 6 the personnel officer sent McEvers a letter[3] notifying him of his termination pursuant to the provisions of State Merit System Rule 1490[4]—a rule providing the foundation for Part V E of the Official Corrections' policy set out in the Employee Handbook.[5]

On November 16, 1976, McEvers through an attorney advised Corrections that he was requesting a hearing before the Oklahoma State Personnel Board in regard to his discharge. Such hearing took place on March 10, 1977. The Board found that McEvers was absent for three consecutive days without authorization, proper notification, or

---

3. The letter dated August 5, 1976, reads: "This will officially notify you that your services with this institution have been terminated effective July 31, 1976. This action is being taken under Rule 1490 of the Oklahoma Merit System."

4. "Any employee who is absent from duty for three (3) consecutive days without proper notification or proper authorization thereof shall be deemed to have resigned his position."

5. Part V E reads:
   Employees shall advise their supervisor when they cannot work their regularly assigned work schedule. Failure to notify can

result in the loss of pay or loss of annual leave time. If an employee is entitled to no leave time, such employee, upon absence, will be put on leave without pay.
   Any employee who is absent from duty for three (3) consecutive days without proper notification, proper authorization, or good and sufficient cause shall be deemed to have resigned his or her position and has no right to appeal. He/she also may lose his/her right to accumulated annual leave at the discretion of the Department of Corrections. SPB 1410 and 1490.

good cause which resulted in a resignation. The termination, therefore, was upheld.

McEvers appealed the decision to the district court. The trial judge heard the matter and remanded it to the Board "for the taking of further testimony regarding the use of the receptionist . . . for receiving notice from employees of impending absences." Upon receipt of additional testimony, the trial court concluded that the Board's decision was "clearly erroneous in view of the reliable, material, probative and substantial competent evidence presented *and further* that petitioner . . . did not abandon and resign his position and that the appointing authority . . . did not act properly in terminating . . . [his] employment." (emphasis added) The order reinstated McEvers "without loss of pay from date of termination, except for sixty days forfeiture pay."

## II

■ In ordering the forfeiture the trial judge imposed disciplinary punishment and this had to be founded on a conclusion that McEvers arbitrarily took an unauthorized, indeed, a forbidden and unnecessary leave of absence.[6] The judge made no findings of foundation facts but did state the following legal conclusions: (1) The decision of the Board was "clearly erroneous in view of the reliable, material, probative and substantial competent evidence";[7] (2) McEvers "did not abandon and resign his position"; and (3) Corrections "did not act properly in terminating" McEvers. In order to reach these conclusions the trial court had to adopt the theory McEvers advances in his brief concerning the operative facts, namely that: (1) the "clear and uncontradicted testimony" was that McEvers' "immediate supervisor knew the [*sic*] appellee's [McEvers] absence in advance," and (2) "notification was caused to be given to appellee's immediate supervisor by appellee's mother"—

facts, according to McEvers, which render the termination illegal.

The problem is that even if we accept the legal premise as valid, we cannot find any evidence of such facts in the record at all, much less uncontradicted evidence. To support his first assumed fact McEvers points to his conclusionary response to a question by one of the Board members:

"Did you discuss with your superiors, your supervisors the reason that you wanted time off?"

"Yes ma'am, I told him, he knowed why I wanted off."

Clarification of this nonspecific generalization came from the supervisor, J. W. Smith, who said that McEvers came to him about three weeks before he quit work and told him that "he [McEvers] wanted to go to California to pick up his kids." With reference to this reason Smith said, "I took it into account but I couldn't get it [the leave] for him and that is why I told him he could see Major Sorrells, which is my immediate supervisor."

Smith was given no advance notice that McEvers planned to take off from work August 1, and he certainly did not know McEvers was doing so for the purpose of picking up his wife in Amarillo, Texas. Nor was Smith told that McEvers might be gone for several days to iron out some domestic problems. The first word Smith said he received about what became of McEvers came around 1300 hours on Tuesday, August 3, when the switchboard operator relayed a message to him regarding a call she received from McEvers' mother, who, without saying why, said her son would not be at work that day.

## III

■ As we mentioned earlier the trial court's order seems to be pitched on two

---

**6.** Of course, McEvers has been working as a truck driver in the meantime and to order that he be paid for all the time he has been off, except for two months, is in reality a windfall rather than a penalty.

**7.** This language is taken verbatim from 75 O.S. 1971 § 322(e).

grounds, namely: (1) the Board's decision was clearly erroneous for the lack of sufficient evidence (concerning what we are not told); and (2) McEvers did not abandon or resign his position. These two conclusions do not appear to be interrelated—that is, (2) is not a sequitur of (1)—because they are separated with the independent conjunction "and further." [8] The first conclusion must refer to the facts found by the Board and so we will examine them. The Board found that McEvers was absent from his post from August 1 through August 5 without authorization or proper previous notification to his supervisor of the impending absence as required by Rule 1490 [9] and Paragraph V E of the Employee Handbook.[10]

Was the finding of the Board clearly erroneous in view of the evidence? It is difficult for us to see how it was. It is not disputed that McEvers chose to foresake his post, although he was denied a leave of absence. Thus he admits his desertion was unauthorized.

But, did he give "proper notification" as he insists he did, and if so, does that excuse his absence under the circumstances?

The personnel officer, James Sconzo, testified that prior to the time in question the penal institution had issued an "operational memorandum" establishing policy on leaves consistent with the provisions of the Employee Handbook. He said an employee's request for an annual leave must be submitted to his supervisor at least three working days in advance of the proposed absence. Sconzo said the memo also outlines the procedure employees are supposed to follow in reporting unforeseeable absences. "The only time an employee is allowed to call in an absence," he explained, "is when [he] is sick. . . . In other words, he can't call in and say I am going to the grocery store today, or I am going to pick my wife up at the airport. The proper procedure is if you are sick, you may call in,

naturally you cannot get leave approved in advance if you are sick. The way the memorandum reads, 'unless incapacitated, the employee will call in, not a member of his family or another disinterested person.' It also states you will call your boss and not anybody that just happens to answer the phone. I will go along with Mr. McEvers saying we can use the switchboard operator, because sometimes when the shift is just starting, it is difficult to get in on the line at the Captain's station. So it is permissible to use the Switchboard Operator . . . [but] only . . . if you are sick."

This was the state of the evidence when the Board voted to uphold the termination. Upon remand Sconzo said that besides sick leave there were also "enforced leaves" due to emergencies and these had to be approved by the supervisor. The procedure in emergencies is to call the supervisor or someone in the administration. Sconzo testified that the August 1976 prison time sheets regarding McEvers "showed 'no notification' which," he said, "would mean that the Captain did not receive proper notification that he [McEvers] was absent." Finally, Sconzo said he knew of no case where a person got leave, other than for sickness, by simply calling the switchboard operator.

McEvers then said he had called in "quite a few" times for emergency leaves and he simply told the switchboard operator he would not be at work that day and nothing ever happened. He said he knew of other employees doing the same thing and never knew of anyone getting fired. McEvers put on the stand a former employee who said he too had taken emergency leaves from time to time and all he did was call the operator to tell her about it. A fellow officer testified to the same effect.

■ This testimony, if true, affords McEvers no effective protection, however, for at least two reasons: (1) rule violations even if frequent cannot operate to destroy

---

**8.** *See* quotation appearing at the end of Part I.

**9.** *See* note 3 *supra* and accompanying text.

**10.** *See* note 5 *supra*.

or modify official rules or prevent their enforcement; and (2) the violations spoken of by McEvers and his witnesses were related to emergencies—a type of situation not present here.

## IV

McEvers places considerable emphasis on the holding in *Corporation Comm'n v. Oklahoma State Personnel Bd.*, 513 P.2d 116 (Okl.1973). Its inapplicability, however, is apparent. There the Commission discharged an employee upon finding that she had abandoned her job as a result of being absent from it for three consecutive days without authorization. The employee appealed to the State Personnel Board and it, after hearing the evidence, reinstated the employee. The Commission unsuccessfully petitioned the district court for a reversal of the Board's decision and finally appealed to the high court for the coveted relief. In rejecting the Commission's contention the court in effect held the Board's finding— that the Commission had proper notification of subject employee's impending absence and the reason for it—was not clearly erroneous because it heard sufficient evidence to support the finding. McEvers seizes upon a comment made by the court which he takes to mean that an employee can never be found to have abandoned his job if the employer has actual Rule 1490 notice that the employee is going to take off. This construction of the dicta is far too broad. The ambit of the employee's prerogatives does not extend beyond the factual context of the opinion. The court itself recognized this and in a footnote alluded to limitations on a 1490 notice saying: "This is not to say, of course, that notification of an arbitrary and capricious declaration of intended absence would not still leave the employee subject to disciplinary action." [11] Certainly if an unauthorized absence, with or without notice, is unnecessary or without sufficient reason it is arbitrary. And if it

results from an unpremeditated impulse it is capricious.

And so there are at least two significant reasons why *Corporation Commission* lends no aid or comfort to McEvers. One, the clear weight of competent evidence presented to the Board here is that no administrative official at the penitentiary knew McEvers was going to take off from work. After he failed to show up at work no official knew why and none knew where he was, nor whether or when he intended to return. Certainly it does not follow from his request for an annual leave that his superiors knew he was going to take one regardless. The alleged call on Saturday, if made to the switchboard operator by McEvers' mother, was inoperative as a "proper notification" because it was not necessitated by sickness or by any incapacitating emergency, nor was there any evidence it reached any of his superiors.

The second reason is that McEvers' absence from work was premeditated and deliberate, occurring as it did after his request for an annual leave had been thrice rejected. Before McEvers ever left town, according to his testimony, he made arrangements with his brother to call the prison switchboard operator the third day of his absence—a precaution which, if true, substantiates a wilful predetermination to take an unauthorized leave. Thus the belated phone call, if made by McEvers' mother, amounted to no more than a "notification of an arbitrary . . . declaration of [an] intended absence," to put it in the language of the *Corporation Commission* footnote.[12] Therefore, the Board could have found, and evidently did find, such notice ineffective to prevent a Rule 1490 resignation on August 3, and that Corrections' August 6 termination letter was essentially a formal acceptance of the resignation.

Frankly, if the position of Corrections and the Board were not to be upheld in this case it is difficult for us to see how the

---

11. 513 P.2d at 120 n.2.

12. *See* note 11 *supra* and accompanying text.

prison officials would ever be able to maintain any kind of administrative control over the facility. To judicially declare McEvers' conduct permissible would be to turn the prison management over to the employees and let each determine for himself when he will or will not work. Obviously no institution much less a state penitentiary can operate in such a manner. In the context of the facts here it is vitally important that a sufficient number of guards be on duty 24 hours a day. Public protection demands it.

The rules must protect the employer as well as the employee.

The judgment of the trial court is, therefore, reversed and the decision of the Board is affirmed.

BACON and NEPTUNE, JJ., concur.